# Fisher *against* Worrall.

A misrepresentation by a vendor of an occult quality in land, although it may be made in ignorance of the truth, and although the vendee agrees to run the risk of this, is, in an action to recover specific performance of the contract of sale, a decisive objection to the plaintiff's recovery.

ERROR to the Common Pleas of *Perry* county.

Charles Worrall against William Logan Fisher. This was an action of covenant, in which the plaintiff, the vendor, sought to recover a judgment in execution specifically of an agreement for the sale of a tract of land, which is thus set forth in his declaration:

William Logan Fisher was summoned to answer Charles Worrall of a plea that he hold to him the covenants between them made, according to the force, form and effect of certain articles of agreement between them made, &c., and whereupon the said Charles Worrall, by his attorney, saith: That whereas, by certain articles of agreement made at Mifflin county, the 6th day of July 1840, between the said Charles Worrall, of the one part, and William Logan Fisher, by the name of William Logan Fisher and Charles W. Morgan, of the other part, (which said other part, with the seal of the said William Logan Fisher, sealed, the said Charles Worrall here into court brings, whose date is the day and year aforesaid), it was concluded and agreed by and between the said parties; and the said Charles Worrall did covenant by the said articles, that he the said Charles Worrall, for and in consideration of the sum of $9000, to him agreed to be paid by the said William Logan Fisher, by the name of Fisher and Morgan, would, on or before the 1st April then next, (1841), by good and lawful deed, well and sufficiently grant, convey and assure in fee-simple, clear of all encumbrances, unto the said Fisher and Morgan, their heirs and assigns, all that certain messuage, tenement and tract of land in Oliver township, Mifflin county, bounded on the north by the

[Fisher v. Worrall.]

Hon. John Oliver's residence, on the west by lands of John Robinson, on the south by lands of John Masden, and on the east by lands of Robert Hope and others, containing about 170 acres, be the same more or less; and the aforesaid William Logan Fisher, for himself, his heirs, executors and administrators, did covenant and agree to and with the said Charles Worrall, by the same agreement, that they the said William Logan Fisher and Charles W. Morgan, their heirs, executors and administrators, or some of them, should and would on the execution and delivery of the said deed as aforesaid, well and truly pay or cause to be paid unto the said Charles Worrall, his executors, administrators and assigns, the sum of $9000, in manner following, to wit: $2000, part thereof on the delivery of the deed for the premises, and the residue as follows: $3000 on the 1st July next (1841), with interest from the 1st April next (1841), and the residue, being $4000, in eight equal annual payments of $500 each, without interest, to wit: the first payment of $500 to be made on the 1st April 1842, and the remaining payments to be made on the 1st of April of each year thereafter, until all be paid; and that the said Fisher and Morgan would give to the said Charles Worrall bonds and mortgages for the security of the payment of the same; and upon the executing and delivery of the said bonds and mortgages, the said Charles Worrall did agree to give the said Fisher and Morgan possession of the premises. And the said Charles Worrall did further agree to give them, the said Fisher and Morgan, the right of digging ore immediately after signing the said article, and also to transfer to the said Fisher and Morgan the lease of the said property between him, the said Worrall, and the tenant on the premises, as by the said articles of agreement more fully appears. And the said Charles Worrall in fact saith, that although he the said Charles Worrall, from the time of making of the said articles of agreement hitherto, hath well and faithfully performed and kept all and singular the covenants and agreements in the said articles contained, which on his part were to be done and performed; yet he, the said William Logan Fisher and the said Charles W. Morgan, or either of them, did not pay unto the said Charles Worrall the said $2000, or any part thereof, on the execution and delivery of the said deed as aforesaid. Nor did the said William Logan Fisher and the said Charles W. Morgan, or either of them, pay the said sum of $3000 on the 1st July next (1841), with interest from the 1st April 1841; nor did the said William Logan Fisher and the said Charles W. Morgan give their bonds and mortgage unto the said Charles Worrall, for the payment of $500 on the days and times beforementioned, which unto him the said William Logan Fisher ought to have been given at or upon the execution and delivery of the deed as aforesaid, according to the form and effect of the said articles of agreement. And so the said Charles Worrall saith that the aforesaid William Logan Fisher, (although often required), his

[Fisher v. Worrall.]

covenant aforesaid hath not kept, but broken, and hath hitherto refused, and still doth refuse, to keep the same, to the damage of the said Charles Worrall $20,000, and therefore he brings suit.

The plaintiff, after giving the agreement in evidence, proved that on the 7th April 1841 he tendered to Wm. L. Fisher a deed in execution of the contract, and that he had quitted the possession of the land which he might take; but Fisher refused to accept it, or to have anything to do with the land. The plaintiff also proved that Fisher had said, some time before, that he would not accept the deed, or take the land.

The defendant then proved that the defendant and Charles W. Morgan were iron-masters, and then engaged in carrying on that business in Perry county, and were very desirous to obtain iron ore; that they purchased this land with a view of securing the iron ore that was in the land; and they gave in evidence the following letter of George Worrall to Fisher, dated 7th May 1840:

"I understand you were in our neighbourhood hunting iron ore. I have a great quantity on my farm, such as the iron-masters of Perry county are getting here. Thomas & Co. have delivered some of the blooms made of the same ore down the country, and tell me they can make nails out of the blooms, the iron is so fine. I will dispose of my farm, containing 168 acres, on trade for a small farm in Cumberland, if you have such. My farm is near the Three Locks in Mifflin county. I wish you would come up and see, or send me word. Direct your letter to Shade Mills Post-office, Mifflin county."

The defendant then proved by a number of witnesses that he had made use of the necessary skill and industry to obtain ore on the land, but it was not to be had; that this was before the 1st April 1841, when the contract was to be executed; and that when he discovered that he was disappointed in his expectation of getting ore, he declared he would not take the land.

The plaintiff then proved by a witness who was present at the execution of the article of agreement, that when the parties spoke of the price of the land, Fisher said, if he got ore, as he expected, it would be cheap enough; but that he had to take the risk of that.

The plaintiff then executed and filed the following stipulation: I, Charles Worrall, the plaintiff, do hereby stipulate and agree that upon the jury finding a verdict for me in this action, for the whole amount of my claim as stated in the first point to the court by my counsel, to wit, for the sum of $8682.21, being the whole amount of the purchase money of the land mentioned in the agreement which is the foundation of the action, I will release and acquit the said William Logan Fisher of and from the sum of $3280.56, part of the said verdict, being that part of the purchase money which fell due from and after the 1st of February 1841, upon the said

[Fisher v. Worrall.]

William Logan Fisher and Charles W. Morgan executing to me eight bonds for $500 each; the first payable on the 1st April 1842, and one payable at each 1st April, thereafter, until the whole be payable, and executing a mortgage of the tract of land sold by me to them to secure the payment of the said bonds; the same to be done within such reasonable time as the jury shall allow.

Witness my hand and seal the 3d August 1842.

The plaintiff requested the court to charge the jury upon the following points:

1. If the jury believe that the plaintiff has truly performed all the covenants and agreements contained in the articles which he was bound to perform, and the defendant has entirely failed on his part, then the plaintiff is entitled to recover the purchase money of the land as mentioned in the said articles of agreement as the measure of damages upon the principles of a calculation reducing the payments to cash.

2. If the jury believe that William Logan Fisher gave notice to Charles Worrall before the 1st April 1841 that he would not comply with his contract, there was no necessity for making any tender of the deed or title, and the proof of such tender under such circumstances is not essential to the plaintiff's right to recover.

3. If the jury believe that the parties to this suit executed and completed their contract and both understood it so, and William Logan Fisher, the defendant, insisted on the same being finally executed and placed upon record before he left town, and it was so done, the fact of Charles W. Morgan not signing it, will not prevent the plaintiff from recovering in this suit.

*Reed* and *Alexander,* for plaintiff in error. It is the highest power of a Court of Chancery to decree the specific execution of a contract; and it will never be exercised but in a clear case of right, and when the party has not an adequate remedy at law. In this case it is clear that the agreement was entered into by the defendant in consequence of the representations made by the plaintiff with regard to the iron ore to be found in the land, which turned out to be false; and whether the truth was known to the plaintiff or not, the whole object of the defendant having been defeated, it is a good defence to a bill for specific execution. 1 *Vez.* 446; 1 *Watts & Serg.* 269, 378; 2 *Watts* 151; 6 *Johns. Chan.* 422; 13 *Vez.* 25; 1 *Fonb.* 49; 13 *Vez.* 228; 1 *Sch. & Lef.* 129; 1 *Mad. Chan.* 360; 7 *Watts* 107; 1 *Sm. Chan. Pr.* 428; 6 *Whart.* 540–2. But it is fatal to a decree of specific performance that it requires an act to be done by a third person not a party to the suit. The deed not having been tendered on the day, the defendant was not bound to accept it afterwards. 9 *Serg. & Rawle* 45; 3 *Serg. & Rawle* 564; 1 *Johns. Chan.* 369.

*Watts,* for defendant in error. The jury having found the fact

[Fisher v. Worrall.]

that the plaintiff had duly performed his part of the contract, and that there was no fraud, the only question that remains to be discussed in the cause is, whether a vendor may have the specific execution of his contract. In all cases the rights and remedies of a party should be equal and mutual; a vendee may have specific performance through the medium of an action of ejectment, and it is not easy to discover why the vendor may not also have a remedy to attain the same object. It cannot be because our courts have not the power. In our mixed system of law and equity we are constantly blending the remedies of a court of law and chancery, and there can be no case more fit than the present to establish the principle. But it is said the defendant has been disappointed in the object of his contract, and therefore he is entitled to relief; but the answer is that he expressly took upon himself the risk of that, about which he had examined the land, with opportunities equal, if not greater than the plaintiff had of judging of the probabilities of finding ore on the land. 11 *Serg. & Rawle* 109. It is no objection that the deed was not tendered on the day; first, because the defendant said he would not comply with his contract; and again, because time admits of compensation in equity. 9 *Johns.* 465.

The opinion of the Court was delivered by

GIBSON, C. J.—The verdict, in this instance, is avowedly for the price of the land; but there is a vice in it, as well as in the cause of action, which must eventually preclude a recovery. Defence upon equitable grounds may be taken to an action for purchase money even at common law; and with greater reason it may be taken to such an action where it is employed to perform the office of a bill for specific execution. The first inquiry, then, is, what would a chancellor decree on all the circumstances of the case disclosed by the evidence?

The decisions on the subject of misrepresentation as an answer to a bill for specific performance, are not entirely consistent with each other. In *Wellingham* v. *Joyce*, (3 *Vez.* 168), an agreement for a lease, which had been procured by representing the applicant to have long been the tenant of the person who recommended him, and punctual in the payment of his rent, was not deemed proper for specific performance, because it was thought the respondent would not have entered into the agreement had he known, what was true in fact, that the applicant had been the tenant of the person only a short time, and had been distrained for the rent and taxes. On the same principle was *Phillips* v. *Buckingham*, (1 *Vern.* 227), in which it appeared that the vendor had previously broken off a treaty with the same purchaser on a difference about the price; on which the latter procured Chancellor Nottingham's secretary to negotiate the purchase in the name of the chancellor's son, to whom the vendor professed himself willing to part with the

estate for less than he would take from another, and desired the chancellor to name the terms; but the lord keeper refused to execute the contract. Lord Thurlow attempted to cast a shade on the authority of that case in *Irnham* v. *Child*, (1 *Bro. C. C.* 95); but it is sustained by Lord Bathurst's decision in *Eyre* v. *Popham*, in the appended note. The principle, however, seems to have been narrowed by the vice-chancellor in *Fellowes* v. *Gwydyr*, (1 *Simons* 63), who enforced the contract, though the purchaser had obtained peculiarly favourable terms by untruly representing himself to be the agent of a person whom the vendor was willing to oblige, because the purchaser did not *know* that he could not have obtained the same terms in his own name. I am unable to see the justice of that, or what the vendor had to do with the knowledge or motive of one who had decoyed him into a bargain he would not otherwise have made, by false pretences. No untruth can be entirely blameless; and he who practises a gratuitous deceit must answer the consequences of it, independently of all consideration of his motive. And such is the principle of *Twining* v. *Morris*, (3 *Bro. P. C.* 326), in which the master of the rolls refused to execute a purchase, because the vendor's agent had bid for the purchaser, and unintentionally cast a damp on the sale, by creating a belief in the bystanders that he was bidding in the estate for the vendor. Yet there had been no design to represent anything; notwithstanding which, it was thought to be enough that the vendor had suffered by a misconception not of his own making. It is difficult to conceive how there could have been misrepresentation in *Fellowes* v. *Gwydyr*, without a sinister motive; and it was said by Lord Manners, in *O'Rourke* v. *Percival*, (2 *Ball & Beatty* 62), to be an established principle of the court, not to decree specifically where it does not appear that the party calling for the chancellor's aid has acted, not only fairly, but in a manner clear of all suspicion. The preceding cases go to misrepresentation as to the person of the purchaser; but they disclose a principle of general application, that where the assent of a party has been procured through misapprehension induced by the conduct of him who insists on the bargain, a chancellor will leave him to his remedy at law.

But misrepresentation of the thing sold is equally decisive. Thus in *Shirley* v. *Stratton*, (1 *Bro. C. C.* 440), where the vendor represented the estate as clearing £90, but suppressed the fact that a wall on it was to be repaired at an annual expense of half the sum, the court dismissed the bill. And in *Shovel* v. *Bogan*, (2 *Eq. Ca. Abr.* 688), a false representation of the quantity, the land being sold by the acre, was allowed to have the same effect. So in *Buxton* v. *Lister*, (3 *Atk.* 382), purchasers who had been induced to agree to an exorbitant price for timber trees by the false assurance of the seller that certain timber-merchants had valued the lots at so much, were not held to specific execution. I have found no

case of misrepresentation as to the quality of the soil but *Scott* v. *Hanson*, (1 *Simons* 13), and there the estate was represented to be uncommonly rich watered meadow-land; but it was in truth only imperfectly watered. The vice-chancellor agreeing with Sir William Scott in *Trower* v. *Newcome*, (3 *Mer.* 704), that an indefinite and vague representation was to be treated by the purchaser only as a ground of inquiry, was of opinion that the expression " uncommonly *rich* watered meadow-land," had regard, not to the watering, but to the soil; and considered the whole as a loose observation of the vendor or the auctioneer, on which the vendee ought not to have placed reliance. Undoubtedly a vendor may praise to the most extravagant extent, qualities which are susceptible of inspection; but a misrepresentation of an occult quality, in regard to which the vendee is not supposed to buy on his own judgment, would be followed by very decisive consequences. Now what is the case at bar?

The overture came from the vendor. He wrote to the vendee, an iron-master who had been hunting ore in the neighbourhood, that he had a great deal of it on his land, of a fine quality, and such as the iron-masters in Perry county were getting; offered to sell him his farm, and invited him to view it. The vendee came, and was shown the tail of a vein at a place where there had been an opening, but it was partly filled up. He was assured that there was a very great quantity of it, and that the vein was a foot thick; relying upon which, and declaring that the ore, not the land, was his object, he struck the bargain. The mine was on lease to a man of the name of Conwall, who had desisted from working it, and who testified at the trial that the produce was not worth the expense; but this fact, so far as concerned the scarcity, was not communicated. Such is the case made out by the proofs on the part of the defendant.

The material circumstance added to it by the proofs on the part of the plaintiff, is, that the defendant was persuaded to take the risk of the ore on himself, and to take the property subject to Conwall's lease. But what matters such a stipulation, if the whole contract was procured by misrepresenting the fact which was the sole inducement to the purchase? The mine was found to be worthless. The thickness of the vein proved to be, not only a vast deal less than a foot, but so inconsiderable as not to be worth the working of it; and the object of the purchase, induced, as it was, by the vendor's positive assertion of a fact which he at least did not know to be true, had utterly failed. Was not the bargain, then, procured by misrepresentation?

The circumstances of the case resemble those of *Young* v. *Clerk*, (*Prec. in Ch.* 538), which was a bill to have specific performance of articles for a lease. The defendant, who had not seen the land or known anything of its value, viewed it in company with the plaintiff, who had been tenant to the preceding owner, then re-

[Fisher v. Worrall.]

cently dead, and who gave the defendant the only information he
received from any one.   Having no judgment of his own as to the
annual value, he asked to see the counterparts of the leases to the
under-tenants, but was shuffled off, and prevailed on to execute the
articles; shortly after which he discovered that he had been greatly
imposed on.   Lord MACCLESFIELD was clearly of opinion that he
was not bound to enforce articles when unreasonable, or founded
in fraud, and when it would be obviously unconscionable to assist
the party; and that as the articles before him were of that sort,
though no direct fraud was proved, it was proper to leave the
parties to their remedies at law.   The case before us, however, is
much stronger, in respect that the vendee was compelled to rely
on the representation of the vendor, while the defendant in *Young*
v. *Clerk* might, by insisting on the production of the leases, or by
consulting men of judgment, have ascertained the annual value
elsewhere.   *Brereton* v. *Cowper*, (2 *Bro. P. C.* 535), is another case
of this stamp.   These show that to assert for a truth what the party
does not know to be so, is equivalent to the assertion of a known
falsehood; and that a chancellor will not execute a purchase where
the vendee has relied on the vendor's unfounded assertion.

Principles of equity are more delicate and subtle in their tex-
ture than rules of law; and where the application of them to the
facts and circumstances of a cause is left to the unpractised hand
of a jury, such a verdict as the present may well be expected.
The proper direction would have been, that, taking the evidence
on both sides to be true, the plaintiff could not recover.

The omission to tender the conveyance at the day would be
unimportant, though the old doctrine that time cannot be of the
essence of the contract, has given place to a more reasonable one.
Perhaps the proper rule has been laid down by Chancellor KENT,
in *Benedict* v. *Lynch*, (1 *Johns. Ch. R.* 374), that where the appli-
cant for specific performance has omitted to perform his own part,
without being able to assign a justification or excuse for it; and
where there is nothing in the acts or conduct of the other party
which amounts to an acquiescence in the delay, the court will not
interfere.   But was there not a justification of the plaintiff's omis-
sion in the defendant's notice through his agent that he would
not abide by the bargain?   Instead of a monition that punctual
performance was expected, it was a disavowal of the contract, and
a waiver of all performance whatever.   It was said by Mr Justice
WASHINGTON, in *Blight* v. *Ashley*, (*Peters' C. C. Rep.* 24), that a
man bound to do a thing must do it, or offer to do it, unless the
other has dispensed with it beforehand.   The principle that a man
is not bound to go through the form of a tender which he has been
told would be rejected, is a common one, and exemplified in *Bul-
ler's Nisi Prius* 96, by the case of a tenant who has waived a
tender of notice to quit by disclaiming the tenancy and attorning
to a stranger.   Had not the conveyance been faulty in misdescri-

bing one of the grantees, it might have been tendered at any time before suit brought, or perhaps at the trial.

But the decisive defect is in the verdict, not because it is for instalments not demandable at the suing out of the writ, for the action was brought to enforce, not only payment of the instalments due, but the giving of security for those to come; and this could be done only by a conditional verdict for the whole. But the condition imposed by the jury, is one which a chancellor would not have imposed. The verdict is for the gross amount, time being given to deliver bonds and a mortgage for the immature instalments, to be executed by Mr Morgan and the defendant himself, in order to meet the stipulation filed in the cause by the plaintiff. But Mr Morgan is a stranger to the cause and the contract; and I take it, a party is not compellable by attachment or a penalty to procure the joinder of another whose actions he cannot control. The old doctrine on the subject has given place to a more rational one. That a vendor shall not be forced to procure the joinder of his wife, was determined by this court in *Seirer* v. *Clark*, (7 *Watts* 107); and there is no room for a difference, in this respect, between a wife and a stranger. A party who covenants to procure such a joinder, is doubtless liable for a failure in damages proportionate to the loss; but not stipulated damages in the shape of the vhole purchase money, which may be exorbitant. Had the plaintff entitled himself to specific performance of the other parts of the ntract, and been content to take such bonds and such a mortʾe as the defendant could give him, a verdict to that effect would ʾ been well; but he was not entitled to anything further.

*Judgment reversed.*